### MEHEGAN *v.* NEW YORK CENT. & H. R. R. CO.

*(Supreme Court, General Term, Fifth Department. June 23, 1892.)*

**ACCIDENTS AT RAILWAY CROSSINGS—CONTRIBUTORY NEGLIGENCE.**

    Where a person in crossing a railway track does not look at a switching train momentarily stopped, but which, it is plain to see, is at any moment likely to start, no recovery can be had for such person's death, caused by the train suddenly backing up and striking him.

Action by Catherine Mehegan, administratrix of Cornelius Mehegan, deceased, against the New York Central & Hudson River Railroad Company. From a judgment entered on a verdict in favor of plaintiff in the superior

court of Buffalo, and from an order denying defendant's motion for a new trial, made on a case and exceptions, defendant appeals.    Reversed.

The case was removed from the superior court of Buffalo to the supreme court under Code Civil Proc. § 273.

Argued before DWIGHT, P. J., and MACOMBER and LEWIS, JJ.

*James Frazer Gluck*, for appellant.    *Seward A. Simons*, for respondent.

MACOMBER, J.    The plaintiff's intestate, Cornelius Mehegan, was killed at a railway crossing on the 20th day of February, 1888, on Michigan street in the city of Buffalo, for which killing this action was brought by the plaintiff in behalf of the next of kin of the deceased.    The deceased had in charge a small cart and a dog which assisted in drawing it, and as he was attempting to cross one of the tracks of the defendant's road he was struck by a car which was backed from the east, and received such injuries as that he soon died therefrom.    He was 18 years of age, and entirely familiar with this railway crossing.    It is contended by the learned counsel for the appellant that this action has been disposed of by the decision rendered herein by the court of appeals.    In the decision of that court in this case (*Mehegan* v. *Railroad Co.*, 125 N. Y. 768) the opinion of the court is not there printed, but may be found in 26 N. E. Rep. 936.    It is contended, on the other hand, by the learned counsel for the respondent, that new evidence was adduced upon the trial now under review, which takes the case out of the operation of the decision of the court of appeals.    It is necessary, therefore, to see, in order to arrive at a correct conclusion, what facts were before the court of appeals as contained in the record of the other trial, in order to ascertain whether or not the alleged new evidence now offered for the first time modifies in any essential particular the condemnation which the case there received by the opinion pronounced by Judge EARL.    The case on the other appeal has been furnished to us, and from it the following facts, in addition to those already stated, appear, and, as summarized by the opinion of the court of appeals above alluded to, are as follows:    A short time before the accident, the engine, drawing seven cars, passed from the west side of the street, on what is called the "house track," to the roundhouse, which was at least 600 feet east of the street; and then it was backed upon a switch track, called the "scale track," which was about 449 feet long, and was, by means of switches, connected at both ends with the house track.    Upon the scale track four freight cars were standing, and the train was backed against them and was coupled to the rear of the seven cars, and then the two rear cars of the four were uncoupled, the purpose being to back them and shunt them across the street into the yard on the west side.    After the four cars were thus coupled, the rear end of the train was about 114 feet from the street.    After the deceased came upon the sidewalk, within 29 feet of the northerly rail of the track, he had a plain view, without any obstruction, of the whole of the switch track and of the house track east to the roundhouse, and he also had an unobstructed view of the house track for a considerable distance west of the street.    Upon that appeal the contention of the plaintiff was that, as the deceased approached the track, the train was standing just west of the sidewalk, and that it suddenly started back, without any warning to him, just as he stepped upon the track, and thus ran over and killed him.    It was upon that theory alone that the counsel sought to maintain in the court of appeals the recovery had in the courts below.    The court characterized that theory as "not very probable, and it can scarcely be conceived that a standing engine could suddenly back eleven cars and give them such momentum that, by moving less than the width of the sidewalk, the near car would come upon the deceased with such rapidity and force that he could not, by the exercise of ordinary prudence, escape peril.    If he had given any attention to the train, he would have seen that it was not, in any proper sense, a stationary train; that there

were men there operating it; and that, if not actually moving, it would immediately be in motion. The whole situation must have been apparent to any one who would look. Yet, if there was some substantial evidence to sustain this theory, and the deceased exercised the care proper under the circumstances, the case was properly submitted to the jury. I am unable to find an atom of evidence sustaining it." It becomes, therefore, necessary to state in what particulars the present case, as is contended by the counsel for the respondent, differs in the testimony from the one contained in the other appeal. This new evidence, if it exists at all, consists of the testimony of Louis Spohr and of Michael Mahoney. The only difference in the testimony of Louis Spohr from that given upon the other trial is contained in the following quotation from his evidence upon the last trial: · "*Question.* As this train backed up towards Michigan street to the point of collision with the boy, what did it do? *Answer.* All I could see, I saw the train stand still. Just as I came to the bridge, there was a Red Line box car at the end of the crossing on Michigan street. That was the car that struck the boy. *Q.* You came over there, and that car was standing still? *A.* Yes, sir; just for a moment, and then they backed up. *Q.* Five or six feet from the street? *A.* Yes, sir. *Q.* The box car you saw standing there in that way was the car that struck the boy? *A.* Yes, sir; a Red Line car." After cross-examination he was again asked by the counsel for the plaintiff as follows: "*Q.* What do you mean by the train backing up? *A.* When I struck the bridge I saw the cars stop. When I got to the first track she was backing up. *Q.* I want you to state what there is with reference to the stop before it backed up and hit the boy. *A.* It took me from the bridge to the first track. When I was on the bridge, I saw that the car stopped there. *Q.* Standing on the east side of Michigan street? *A.* Yes, sir, beyond the sidewalk, east, four or six or eight feet." The witness Michael Mahoney, when called upon the last trial, did not give any testimony differing in any particular from that contained in the former record, but, after another witness had been called and examined, Mahoney was called back by the plaintiff's counsel, and at that time testified: "I knew John Cotton at the time of this accident. I saw him, before the boy was struck, come down between those cars, and pull the pin, back out, and work his arms, giving the signal to the engineer. At the time he went in to pull that pin the cars came to a standstill." This evidence does not change, in any material respect, the facts disclosed in the case as it existed in the court of appeals upon the hearing already referred to. It is apparent that any observation made by the deceased must have brought home to his intelligence that these cars were a part of a train which was being switched at this point, and that any pause of the cars at the place named was but a temporary matter, and that they would be immediately moved again. It appears to us, therefore, that the deceased, knowing well the situation, took all of its hazards upon himself, and attempted to make the crossing before the cars should be moved again across the sidewalk. We see, in the new evidence, nothing to remove the case from the animadversion made upon the facts of the first trial. It follows, therefore, that the judgment and order appealed from should be reversed.

Judgment and order appealed from reversed, with costs, and a new trial granted, with costs to abide the event. All concur.