### WEST *v.* DETROIT TERMINAL RAILROAD.

RAILROADS—CROSSING ACCIDENT—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—DIRECTED VERDICT.

In an action against a railroad company for the death of plaintiff's decedent, caused by a collision at a public crossing between defendant's train and an automobile in which deceased was a passenger, evidence that the driver of the automobile was familiar with the crossing and its surroundings, and that had he looked before entering upon the danger zone he could not have failed to see the approaching train in time to avert the accident, in the absence of extenuating circumstances excusing his failure to stop, *held*, to justify the direction of a verdict for defendant *non obstante veredicto*, on the ground of the contributory negligence of the driver, which was imputable to deceased.[1]

Error to Wayne; Fead (Louis H.), J., presiding. Submitted October 31, 1924. (Docket No. 5.) Decided January 28, 1925.

Case by Florrie Avery West, administratrix of the estate of Joseph William West, deceased, against the Detroit Terminal Railroad for the alleged negligent killing of plaintiff's decedent. Judgment for defendant *non obstante veredicto*. Plaintiff brings error. Affirmed.

*Monaghan, Crowley, Reilley & Kellogg,* for appellant.

*John J. Danhof, Jr. (J. Walter Dohany,* of counsel), for appellee.

CLARK, J. In ordering judgment for defendant

---

[1] Railroads, 33 Cyc. p. 1117.

On imputed or contributory negligence of passenger riding in automobile driven by another precluding recovery against third person for injury, see note in L. R. A. 1915B, 953.

On care required of driver of automobile at railroad crossings, see notes in 21 L. R. A. (N. S.) 794; 29 L. R. A. (N. S.) 924; 46 L. R. A. (N. S.) 702.

On duty of driver of automobile as to stopping, looking and listening, see note in 46 L. R. A. (N. S.) 702.

notwithstanding the verdict, the trial judge filed an opinion which, although rather long, merits adoption by this court. The facts as recited in the opinion are criticized. It is urged especially that testimony that the automobile moving at a stated rate of speed could have been stopped within two or three feet was ignored, but the testimony relied upon is not to that effect, is incapable of such meaning. After careful reading, we find no reason for changing the statement of facts made by the trial judge.

The opinion:

"Plaintiff brought suit as administratrix of the estate of her husband, Joseph West, to recover damages on account of his death on June 19, 1920, which occurred in a collision between an automobile in which he was riding, but which was owned and driven by one Arthur Williams, and one of defendant's freight trains, at the intersection of its track with Livernois avenue in the city of Detroit. Defendant's motion to direct a verdict in its favor, made at the close of the plaintiff's case and renewed at the close of the testimony, was reserved under the Empson act, the cause was submitted to a jury, plaintiff had verdict, and the reserved motion was submitted on briefs and oral argument.

"As the negligence of the driver of the automobile is imputable to plaintiff's decedent, the question is whether Mr. Williams was guilty of contributory negligence.

"Livernois avenue runs north and south and, at the time of the collision was a dry, hard, wide, dirt road. Defendant's track crosses the road almost at right angles, bearing slightly to the southwest and northeast. Both Livernois avenue and the railroad track were built up above the surrounding terrain. At the crossing the track was raised, the rise beginning about 50 feet south so the track was plainly visible for a considerable distance. The track at the crossing was marked by a regulation crossing sign but there had never been any gates or gatemen at the crossing.

"West of Livernois avenue, the track is straight for 2,108 feet and then curves to the south. The right of way is 66 feet wide. West of the crossing and

along the south side of the right of way are some trees and bushes, their distances from the center of the crossing, as measured by Mr. Williams, being respectively 122, 142, 224, 261, 308, 328, 336, 565 feet. Beyond the 565-foot tree the 'trees were very thick— thick as could be with shrubbery growing up between them' according to Mr. Williams.

"The collision occurred about 1:30 p. m. on a clear, bright day.    The train came from the west.    It was composed of 12 loaded box and flat freight cars, a tender and engine, was over 500 feet long, the box cars were about 12 feet high, and the engine was on the rear end of the train pushing the cars ahead of it.    The leading car was a box car.    The train crew on duty consisted of two lookouts on the leading car, a rear brakeman on the car next to the engine and a fireman and engineer in the locomotive.    The trainmen testified that the train approached the crossing at the speed of about eight miles per hour from the curve, slowing to six miles per hour when nearing the crossing.    The maximum speed testified to by any witness was about eight to ten miles per hour, not to exceed ten miles, unreduced from the curve to the crossing.

"The country adjoining the crossing was unimproved.    There is considerable dispute as to the precise situation but, giving plaintiff's testimony its fullest effect, it appears that south of the crossing the view to the west was completely obstructed by bushes, trees and shrubs to a point 118 feet south of the south rail of the track where there was an open space 30 feet wide.    Most of the witnesses say that a clear view of the track could be had through this open space and that it was customary for them to make their observations of the track at this point.    Mr. Williams stated that at the 118-foot point 'there was an opening space which gave a person a chance to see the track from that point, and that would be the best view you would have from the track' but he later stated that the view was 'hardly any view at all.' After passing the opening, the view was more or less obstructed to and beyond a willow tree which stands 36 feet south of the south rail of the track.    The lowest branch of this tree was 4 feet 6 inches high at the trunk and extended north, about horizontally, a

distance of 13 feet.   The next higher branch was about 6 or 7 feet from the ground at the trunk and extended north 20 feet.   There was no obstruction between the tree and the track except such branches. Livernois avenue is 66 feet wide, the willow tree is on the west side about 8 feet south of the right of way fence and about 54 feet west of the center of the road.   Mr. Williams states that he could not see to the west of the avenue line when 10 feet north of the tree and could not see the tracks to the west when 15 feet north of the tree, also stating that he could see 10 feet or less to the west of Livernois avenue line when 15 feet north of the tree.

"Mr. Williams had been over the road several times per day for some three months prior to the accident. He knew that trains might be expected to cross the road at any time.   It is undisputed that the trains running east usually ran with the engine pushing the cars.   Mr. Williams was familiar with the location of the tracks, the obstructions and general situation.   He had driven an auto about 9 years, sometimes as a professional chauffeur.   The auto he was driving on the day of the collision was a one-cylinder Brush, low slung, the driver's eyes being about 5 feet, 3 inches above the ground and the distance from the front of the car to the driver being from 6 to 8 feet.   He had owned it some time but did not know within what distance he could stop it.   He thought he could stop within 10 to 15 feet when running at 5 or 6 miles per hour.   The car had one seat and had an open top so the driver could readily see to the right, left and front.   Mr. Williams sat on the left side and Mr. West on the right, the latter holding Mr. Williams' little girl in his lap.

"Plaintiff's witnesses testified that the train was running quietly, they heard no sound of bell or whistle, but that when the train was some 300 to 500 feet west of the crossing, the men on the leading car made stop signals and 'hollered.'   The trainmen testified that they yelled when about 50 feet from the crossing as a warning to those in the automobile.   The trainmen first saw the auto when it was some distance south of the 30-foot opening.

"Accepting Mr. Williams' version of the accident as

229—Mich.—38.

true, it appears that he ran his automobile north on Livernois avenue at a speed of 6 to 8 miles per hour until he reached the opening 118 feet south of the track.    He then slowed down 3 or 4 or 5 miles per hour and he and Mr. West looked to the west.    They saw no moving train and Mr. Williams could not see the track but he saw four or five box and flat cars standing on a siding just north of the main track, in the same place he had seen them in the morning. His line of vision to such cars ran between the trees 122 and 142 feet west of the crossing.    After passing the opening, he speeded up his car to 5 or 6 or 7 miles per hour, which speed he maintained until he was struck by the train.    He described his progress:

" 'Well, after looking in every direction, not seeing any train coming, not even any whistle nor any bell ringing, I proceeded very slowly on my way toward the track, looking and listening, if there was any train coming, and when I was pretty near up to the track, I heard a holler, seemed to come from behind, and I looked around, and when I turned back again I was right on the track.'

"Upon cross-examination he testified that at a point 50 feet south of the willow tree (86 feet from the track) and also when 30 feet from the willow (66 feet south of the track) he was able to see through the obstructions and saw the four or five standing cars but saw no moving train.    At 20 feet from the willow, he could not see the track but he continued to look and listen.    So far as his testimony shows the last place he looked or tried to look to the west was at the willow tree.    At that point, he could not see the tracks west of the crossing.    He looked three or four times from the 118-foot opening to the crossing.    He continued at the same speed until within 12 or 15 feet of the track, estimating from where he sat in the car, when he heard the shouting, turned and looked behind, and, upon turning again to the front, found himself on the track with the leading car 'right over the top' of him.    The auto was shoved about 250 feet along the track and Mr. West and Mr. Williams' daughter were killed.

"In setting out the above facts, the testimony most favorable to the plaintiff has been adopted.    However, in view of the argument, it may properly be

noted that while the plaintiff, upon this motion, is entitled to the benefit of such testimony and to the force of the reasonable inferences to be drawn therefrom in her favor, she, having the burden of proof, is not entitled to favoring inferences from a lack of testimony nor from broad general statements when opposed by definite evidence from her own witnesses. Thus, the general statement that the trees constituted an obstruction close to the track does not produce an inference that there were any obstructions closer than were placed by the specific testimony as to distances. The limit of obstruction is placed by Mr. Williams at 15 feet north of the willow tree, which would leave a clear space of 21 feet from the track.   Nor is it necessary to attempt to reconcile or distinguish *Mero* v. *Railroad Co.*, 180 Mich. 1, and *Darish* v. *Scott*, 212 Mich. 139, as to the effect of contradictory testimony by a witness in raising a jury question as to which parts of his evidence are true.   The doctrine announced in the later case would not go to the length of making a jury question of testimony contradicting other testimony by way of correction or explanation. The correction of a misstatement or the clarification of ambiguous testimony does not create an issue of fact.   So there is no issue of fact as to whether, when Mr. Williams heard the shouting, the front end of his car was about 15 feet from the track or that 12 to 15 feet was about the distance to the track from where he sat in the car as the latter statement was made specifically by him to clarify the point.

"Counsel for plaintiff relies upon a line of decisions, of which *Rouse* v. *Blair*, 185 Mich. 632, is the leading case, while defendant relies upon *Colborne* v. *Railway*, 177 Mich. 139, and *Sanford* v. *Railway Co.*, 190 Mich. 390, and similar authorities.   It is not necessary to point out that each of the cases cited has facts and phases which cause it to differ from the case at bar. The fact that there were dissenting opinions in many of the cases indicates that it is not always easy to discern the applicable principle, or how to apply the principle, and that a difference of facts is of prime importance.   Each case has turned largely on its own peculiar circumstances.   Nevertheless, running through the whole line of decisions, there is a recognition of general rules, the difference of opinion

arising from whether the particular case falls within
the rule or within an exception or modification of it.
It seems, therefore, that the logical manner of approach
to the consideration of the case at bar is from the
discovery and application of the rules to the applica-
tion of exceptions to the rule.

"The rule is settled that a railroad track is a place
of possible danger, is to be approached with the pos-
sibility in mind, and such care must be exercised as
a reasonably prudent man would use with a realiza-
tion of the danger. *Prima facie*, it is the duty of
one approaching the track to both look and listen
and, if necessary to assure himself of safety, to stop
in order to look and listen. As late as July, 1921,
in *Amedeo* v. *Railway Co.*, 215 Mich. 50, the Supreme
Court recognized as settled the general rule 'that a
person approaching a railroad track, knowing the
same to be a place of danger, must stop, look and
listen.'

"Certain exceptions to the rule have arisen in con-
nection with 'protected crossings.' And the advent
of the automobile and its general use have so in-
creased the number of accidents at 'obstructed cross-
ings' that distinctions and modifications of the general
rule are urged with special reference to them. How-
ever, it is clear that obstructions to a view of the
track would not relieve one of the duty to exercise
ordinary care but, on the contrary, would impose on
him 'greater care and watchfulness in driving upon the
track than if the view was open.' *Lake Shore, etc.,
R. Co.* v. *Miller*, 25 Mich. 301; *Stewart* v. *Railroad Co.*,
119 Mich. 99. This rule applies to an automobile
driver as he is under the same duty as a pedestrian.
He is required to make observations carefully and at
a place where his safety is assured. He does not
use due care when he waits until he is in a place of
danger before looking. When obstructions prevent
a clear view, he must accept the first opportunity for
a clear view, having his car under such control as will
enable him to stop in safety if such first opportunity
discloses or would disclose an approaching train. And
he is guilty of negligence if he fails to seasonably dis-
cover a train which, by slowing or stopping his car
in a place of safety, he could have seen. *Pershing*
v. *Railway Co.*, 206 Mich. 307; *Lanier* v. *Railway Co.*,

209 Mich. 302; *Colborne* v. *Railway* and *Sanford* v. *Railway Co., supra.*

"However, obstructions to a view do not, apparently, impose upon a driver the duty to stop the car and go forward on foot to make observations. And if the obstructions are so close to the track that there remains no safety zone in which he could have discovered a train by stopping and looking, the question of his negligence in going upon the track is usually for the jury. *Fillingham* v. *Railway Co.,* 207 Mich. 644. Or if the space for clear view is short, circumstances may present a jury question. *Rouse* v. *Blair, supra.* But none of the later authorities has adopted a rule that obstructions relieve the automobile driver from the exercise of ordinary care nor has it abrogated the rule that obstructed crossings must be approached with greater care than is necessary when the view is open. The lack of any opportunity to look raises a correspondingly increased duty to use the other senses and to proceed cautiously.

"The later crossing cases lay great stress upon the fact of the driver's having a clear or an obstructed view while in a place of safety as affecting the question of whether his negligence is a matter of law or of fact. It is also worthy of note that in the cases holding the driver's negligence to be a question of fact, not only was the clear space wanting or short but certain what might be called excusing considerations appeared and were given weight, such as that the driver was lulled into a sense of security by the failure of the railroad company to operate established gates (*Garland* v. *Railroad Co.,* 196 Mich. 695); or that possible danger would threaten him if he stopped where he could see (*Nichols* v. *Railway Co.,* 203 Mich. 372); or that the accident occurred at night and his failure to see the train was partially due to the want of customary lights on the train (*Mills* v. *Waters,* 198 Mich. 637); or that he stopped and listened before going upon the track but could not see the train and there was no safety zone in which he might have stopped, looked and listened (*Fillingham* v. *Railway Co., supra*). The case of *Rouse* v. *Blair,* relied upon by plaintiff, possesses several of these exceptional features. In that case the plaintiff, at a distance of from 100 to 150 feet from the crossing and where he

had a clear view of the track for 1,000 to 1,200 feet, looked and saw no train nor sign of an approaching train. The train which struck him came into this space while his view was completely obstructed and after he had looked. The regular passenger train had gone north while plaintiff was a short distance from the crossing and the train which struck him was an unexpected train coming from the south. The crossing was in a village street much traveled and the train was running at 25 to 30 miles per hour without lookouts or any of the warnings which might reasonably be expected in view of the traffic. And when plaintiff passed the last obstruction, which consisted of refrigerator cars on a side track, he being then from 18 to 20 feet from the crossing at which he was struck, and saw the train, he shut off his power and tried to stop.

"The question in the instant case is whether the conduct of Mr. Williams comes within the rule declaring contributory negligence a matter of law or has some such relieving circumstances as brings it within the exceptions and makes it a question of fact. The manner of Mr. Williams' approach to the clear space adjacent to the track is of much importance.

"Assuming plaintiff's contention that the view of the west was completely obscured far to the south, it nevertheless appears that Mr. Williams had some sort of an opportunity to make observations, and claims he did so, at two points south of the willow tree—at the 30-foot opening 118 feet south and at a point 66 feet south of the south rail, at both of which points he stated that he saw the four or five standing cars on the side track but saw no moving train. Plaintiff's counsel argues that Mr. Williams fulfilled his duty to look by making an observation at the open space because that was the place customarily used by automobile drivers to watch for trains. The other witnesses stated that a clear view to the west could be had at the open space while Mr. Williams character·ized it as the 'best view' and 'hardly any view at all.' If the view was clear so that Mr. Williams performed his duty to look by there making an observation, it is evident that he was guilty of negligence in not seeing the train as a reasonably prudent man making an ordinarily careful observation would have seen it.

"When Mr. Williams looked to the west at these two points, it is incontrovertible that the train, which afterward struck him, was on the track, between the curve and the crossing, and was moving east.   Its distance from the crossing depends upon the testimony adopted for computation.   Taking the extreme figures, the result is that the train, moving at 10 miles per hour, was not more than 132 feet from the crossing when the auto, moving at 5 miles per hour, was at the 66-foot observation point, and the train was not over 176 feet west when the auto left the 30-foot opening 88 feet from the track.   Figuring the speed of the auto, while traversing the opening, at 3 to 5 miles per hour, the train was from 236 to 276 feet west of the crossing when the auto entered the open space 118 feet south and it traveled from 60 to 100 feet while the auto was moving the 30 feet.

"Therefore, as Mr. Williams saw the standing cars between the trees 122 and 142 feet west of the crossing, the head end of the train was not more than 134 feet west of the 142-foot tree when he entered the open space, was not more than 34 feet west when he left the open space, and was not more than 132 feet west of the crossing, or it was between the two trees, when he looked at the 66-foot point.   The adoption of any other figures testified to would bring the train more directly and surely within the direct range of Mr. Williams' vision.   West of the 142-foot tree, the trees along the right of way had spaces between them of 82, 37, 47, 20, 8, 229 feet respectively to the 565-foot tree, measured by Mr. Williams.   The ability of Mr. Williams to see the 4 or 5 standing cars through a 20-foot space and his ability to see the 500-foot train through much larger spaces close to his direct line of vision leads to only one reasonable conclusion, which is that, if he looked at all, he did not look carefully; in addition, it appears that, if Mr. Williams saw the standing cars where he claims he saw them, then, inasmuch as they had a length of from 160 to 200 feet, it was impossible for him to have seen all of them at the 66-foot point south without also having seen the moving train as the train was then, for a considerable part of their length, between him and the standing cars.

"If the above conclusions are not determinative, it is surely beyond question that one of three conclusions must prevail: (1) That Mr. Williams did not look carefully at the observation points, or, (2) That he looked and saw the moving train, or, (3) That he looked carefully but could not see the train because of obstructions producing a 'blind spot' on the track, over 500 feet long plus whatever distance the train traveled during the time Mr. Williams was making his observations, the 'blind spot' being, with reference to the distance of the automobile from the crossing, in the danger zone of the track.    If this was the situation, Mr. Williams had the clear and positive duty to proceed cautiously, to look again at the first clear view of the track, and to keep his car under such control that he could stop in safety if the view should disclose an approaching train.

"After passing the point 66 feet south of the track, Mr. Williams did not look again to the west at any point where, according to his own testimony, he could see the track through the obstructions.    Plaintiff's counsel argues that the distraction of his attention by the shouting affords sufficient excuse for his not discovering the train in time to avoid a collision to make his negligence a question for the jury.    Mr. Williams, however, evidenced no intention of stopping or slowing his car after passing the willow tree.    He continued from the 88-foot point to the track at the same rate of speed.    When the distraction occurred, Mr. Williams was from 12 to 15 feet from the track, the front end of his car being then from 6 to 9 feet of the rail.    He did not know whether he could have stopped his car, running at 5 or 6 miles per hour, within that distance.    He was in a position of danger by his own voluntary act.    He had already entered the clear space.    So far as the testimony shows, the shouting he heard was a warning to beware the train in front.    The shouting did not change his purpose in any way.    His testimony is that he did not try to stop because he had no occasion to stop.    The only reasonable inference is that he had satisfied himself that no train was coming by whatever observations and listening he had done before reaching the clear space.    The most that can be claimed for the diversion is that it prevented his looking upon the

track and discovering the train.   He did not state that he was looking for a train when his attention was diverted and the facts will not warrant the inference.   When he got beyond the 13-foot low limb of the tree, assuming that such limb obstructed his view, he was still 23 feet from the track and the train was not more than 46 feet west of the crossing or not more than 13 feet west of the west line of Livernois avenue.   The tree was approximately 50 feet to his left and could not be an obstruction in front nor to the immediate west of front.   His normal range of vision ever so slightly to the west would inevitably have disclosed the approaching train, if he had been looking carefully.   A natural law cannot be repealed by assertion.   And before the diversion came, the front end of the leading car had passed within the limits of the highway where it could be plainly seen and should have been seen by Mr. Williams.   With such a danger in front, which an ordinarily prudent man would have seen, and with no reason to anticipate danger from behind, his looking back at a shout would not excuse him from negligence, especially in view of the fact that his conduct gives no indication that the shouting caused him to change his course of action in any way.   *Gardner* v. *Railroad Co.*, 97 Mich. 245.

"This cause does not possess those features which are held to excuse one from looking where a view may be had clearly nor from failing to stop in order to look.   Nor does it contain those exceptional phases which have operated to soften the duty to stop, look and listen.   Mr. Williams was threatened with no sudden danger, in trying to escape which he ran into a collision with defendant's train, nor was he confronted with an emergency which confused him.   He had an open road, only one track to watch, only one point of danger to consider, and with ample time and opportunity to stop his car in safety at any point he desired.   The accident was in the daytime, on a bright day, with ample light for clear vision.   He was thoroughly acquainted with the crossing, the track, the obstructions, and the habits of the trains. He was not misled by a failure to operate gates or have a gateman on duty as he knew neither was customary at this crossing.   He was not surprised by a train

entering at high speed upon a stretch of track which he had lately before observed was clear. He was not taken unawares by an unexpected train as he knew a train might appear at any time. He had a clear space near the track where he could have stopped and seen in safety, but he, if his own testimony is true, appears to have approached that space, satisfied that no train was coming because he heard none and because he had looked at a place where there was 'hardly any view at all.'

"In my judgment, Mr. Williams was guilty of contributory negligence as a matter of law. If the 30-foot opening 118 feet from the track presented a clear view, he was negligent in not there discovering the train. If the opening did not present a clear view, he was negligent in not discovering the train at the point of clear view to the track.

"It is true, as urged by plaintiff's counsel, that Mr. Williams had a right to rely upon the defendant's running its trains lawfully and without negligence. But it is also true that he cannot rely absolutely upon a presumption that defendant will exercise due care. Nor is he excused by such negligence from his own duty to look and listen. Under the verdict of the jury, the negligence of the defendant was in running the train at a speed slightly in excess of 6 miles per hour, the rate established by city ordinance, and in not ringing the bell. The language in *Lanier* v. *Railway Co.*, 209 Mich., at page 304, is pertinent here.

"Plaintiff also urges that defendant was guilty of gross negligence in failing to stop when the trainmen had discovered the auto when the train was 300 to 500 feet west of the crossing. The auto was then in a place of safety and the duty to stop did not arise. However, argument on this contention is needless because it cannot be said, as a matter of law, that defendant was guilty of gross negligence, and the question cannot be passed upon in connection with this motion. The contention was made in a request to charge, was refused, and a review of the refusal cannot be had in this proceeding.

"The defendant is entitled to prevail on the motion to direct a verdict and, under the statute, is now entitled to a judgment in the cause *non obstante veredicto.* Judgment, with costs to be taxed, will be so

entered by the clerk in favor of the defendant and against the plaintiff."

Judgment affirmed.

McDONALD, C. J., and SHARPE, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.   BIRD, J., concurred in the result.