SULLIVAN, RESPONDENT, *v.* NORTHERN PACIFIC RAILWAY CO. ET AL., APPELLANTS.

(No. 7,901.)

(Submitted April 3, 1939. Decided July 15, 1939.)

[94 Pac. (2d) 651.]

94

*Messrs. Walker & Walker,* and *Messrs. Gurm, Rasch & Hall;* for Appellants, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

96

*Messrs. McCaffery & McCaffery,* for Respondent, submitted a brief; *Mr. J. J. McCaffery, Jr.,* argued the cause orally.

98

MR. JUSTICE STEWART delivered the opinion of the court.

The plaintiff, accompanied by her son, a boy about twelve years old, drove her car along Garden Avenue in the city of Butte at a point where the avenue is crossed by seven railway tracks—three of the Great Northern, two of the Butte, Anaconda & Pacific, and two of the Northern Pacific. From south to north the tracks are as follows: 1, 2 and 3, Great Northern; 4 and 5, Butte, Anaconda & Pacific; 6 and 7, Northern Pacific. From track 1 to track 6 is a distance of about 175 feet. The Great Northern maintains a "flagman's shanty" between tracks 3 and 4. The other companies do not have flagmen at the crossing.

Plaintiff, who had been familiar with the crossings for thirteen years, was proceeding north. She asserted that at or about a distance of 25 feet from and south of track No. 1, she looked east and west for the approach of locomotives or trains, but did not see any approaching, so proceeded to cross the tracks at 10 miles an hour. She said that at the time she looked she saw an engine on either track 6 or track 7, about 100 feet west of the crossing; that smoke was ascending directly above the engine so that she thought it was standing still. She claimed that thereafter no bells were rung nor whistle blown to warn her of a contrary condi-

tion. When she was on track 6, the engine, moving at a slow rate of speed, struck her car and shoved it about 15 feet and injured her.

In her complaint plaintiff alleged numerous grounds of negligence on the part of the company, such as failure to blow the whistle for the crossing, failure to ring the bell or keep a proper lookout for automobiles, failure to have a yardman or trainman on foot to precede the engine, the violation of several ordinances and of certain rules of the railway company.

The defendants denied the acts of negligence, and affirmatively pleaded that plaintiff was guilty of contributory negligence for the reason that, when she was more than 150 feet from the sixth track from the south, the place of the accident, she had an unobstructed view of the tracks toward the west for a distance of about 335 feet, and that she traveled about 200 feet at a speed of about 10 miles an hour from the point 25 feet south of track No. 1 to track No. 6 without looking to the west, the direction in which she had seen the locomotive which she claimed was standing.

At the close of the evidence a motion for a directed verdict was made by defendants and denied by the court. A verdict was returned in favor of plaintiff for $3,000 and judgment entered accordingly. No motion for new trial was made, and the appeal is from the judgment.

The specifications of error tender three points: (1) That plaintiff failed to prove any of the acts of negligence alleged by her by any substantial evidence; (2) "That plaintiff was guilty of contributory negligence as a matter of law when driving unto the sixth track, as admitted by her on the stand, a distance of somewhere between 110 and 150 feet from the sixth track, without looking west to ascertain if said locomotive was approaching said crossing"; (3) "That if there was any negligence on the part of defendants, that the ordinary negligence of the plaintiff concurred therewith up to the moment of the collision and was a proximate cause of such collision."

Plaintiff claims that she established negligence in four particulars, and relies upon them, to-wit: Failure (1) to sound

whistle; (2) to ring bell for crossing; (3) to keep a proper lookout for automobiles; and (4) to ring bell before starting locomotive from standing point. Defendants assert that all of the grounds of negligence were either abandoned or no proof thereof offered, except as to the charge that the bell was not rung as the locomotive passed through the yards, and that the whistle was not blown for the crossing.

The accident occurred on February 25, 1937. There was some snow on the ground. Plaintiff and her young son, who accompanied her, claimed that there was much more snow than other witnesses described. They claimed that snow was piled up along the side of the road. The amount of snow was not very important except that plaintiff claimed that she met a truck as she was about to cross the tracks, and that her attention was absorbed in trying to pass it without getting into the deep snow. However, the truck turned off and never passed the car, and she was back in the road before the accident occurred, her theory being that her attention was diverted by another danger. Her exact testimony on direct examination was: "When I saw the locomotive it was just behind the semaphore, I mean a little west of it. I did not pay any further attention to that locomotive. The next thing that attracted my attention was a truck coming down the highway and I watched the truck to see if it were coming towards me and in preparing to meet it, I swung my car to the side of the road and then observed the truck driver giving a signal with his arm out, signaling that he was going to turn. I then swung back into the road again." On cross-examination she said: "When I was on the last track of the Great Northern and the first B. A. & P. track I did look to the west and saw the locomotive standing. From that point on I did not look again to the west because of the fact I saw this truck coming down and I tried to avoid that."

The boy testified: "When I was on the last track of the Great Northern is when I looked over and saw the locomotive. From that time I was looking the other way and did not look over and see the locomotive again until it hit us."

The weather was cold—between 11 and 25 degrees above zero. In a signed statement made to an agent of the railway company just after the accident, plaintiff said: "It was quite cold at the time of this accident, and I had all of the windows in the car closed. There was no frost on any of the windows. As I approached this railroad crossing I did not look either to the west or to the east to see if there was any train or engine coming toward this railroad crossing. I had driven over this crossing for about 13 years and am familiar with it." At the trial she said the window on the left side, the side toward the locomotive, was down a couple of inches, and the one on the right side clear down. The boy testified at the trial for the first time and agreed with the later statement of his mother.

The testimony of the engineer and switching crew was positive as to the sounding of the whistle and the ringing of the bell. The engineer was asked the following question: "When you started east, did you give any signals, if so, where?" And he gave the following answer: "As you leave the freight house and get in the neighborhood of the Belmont Mine, as a rule, you sound one long blast of the whistle, I think the Belmont Mine is two blocks west of Garden Avenue, which would be something like 600 feet plus the width of the street. I sounded one long blast of the whistle. That is to call attention to the tower man that there is an engine approaching, wanting the board. This board is a board that controls the operation of the derail on the Northern Pacific tracks. I think that derail is between Garden Avenue and Warren Avenue. If I did not give the long blast and get this board adjusted, I could not go on east, could not go beyond that board. If we call for the board and the board is given to us, that is a clearing board, we answer by two short blasts of the whistle to let the tower man know that we have accepted the board and going to use it. *Those blasts were given on this date. Those blasts were given as we approached Warren Street, the street west where the accident happened.* Also on that date as we approached Garden Avenue, between the long blasts of the whistle calling for the board, I sounded a crossing whistle for

those two crossings there at the Belmont Mine. I mean the crossing just east of the Belmont Mine and the crossing east of the loading tipple—that would be Garden and Warren Avenue. As we made that movement, the bell was automatically ringing with air. I started the bell ringing from the time we left East Butte going to the freight house with this car. After delivering this car, this bell was never shut off, up to the time we collided with this car. After leaving the freight house on this movement east, I did not stop the locomotive at any point before the collision. I should judge I was traveling at about five miles an hour.'' The witness was corroborated by the other members of the crew and by at least one other witness who lived in the neighborhood. All testified that the bell was rung and the whistle blown.

All of the witnesses who testified for the plaintiff, including herself and her boy, and who assumed to speak on the ques-tion of the bell and the whistle, gave negative testimony. They testified that they were in more or less advantageous positions to hear, but that they did not hear the bell rung or the whistle blown. They did not assume to say as a positive fact that the bell was not rung or the whistle was not blown.

The effect of the changed testimony of the plaintiff with relation to the position of the car windows was to increase the probability of herself and her son to hear the whistle and bell. If the car windows were all closed, as she first stated, they were not as likely to have heard as they would have been if they were open in the manner described at the trial. The change in the testimony was important. It is apparent that plaintiff was seeking to avoid the adverse effect of the rule laid down in 22 Ruling Case Law, at page 1057, which is as follows: ''It is a general rule, however, that as against positive evidence by credible witnesses to the ringing of the bell, or the sounding of the whistle, there must be something more than the testimony of one or more that they did not hear it to authorize the submission of the question to the jury. A mere 'I did not hear it' is entitled to no weight in the presence of affirmative evidence that the signal was given, and does not

create a conflict of evidence justifying a submission of the question to the jury as one of fact.''

This rule has been the subject of comment by this court, particularly in the cases of *Grant* v. *Chicago, Milwaukee & St. Paul Ry. Co.*, 78 Mont. 97, 252 Pac. 382, and *Rau* v. *Northern Pac. Ry. Co.*, 87 Mont. 521, 289 Pac. 580. In the *Grant Case* the court said: ''With respect to defendants' failure to sound the whistle or ring the bell, the plaintiff testified, 'I heard no noise as we approached; I did not hear anything to indicate the approach of a train as we proceeded down the highway towards the crossing;' while Ballinger testified, 'I listened for the whistle or bell but heard nothing; I heard no warning signals from the train or engine as it approached the crossing.' \* \* \* Under the provisions of section 6521, Revised Codes of 1921, the defendants were charged with the duty of sounding the whistle at a point between 50 and 80 rods (between 825 and 1,320 feet), and ringing the bell from such point until the crossing was reached (*Sprague* v. *Northern Pac. Ry. Co.*, 40 Mont. 481, 107 Pac. 412), and plaintiff had the burden of proving that they did not do so. The testimony as to the alleged default in this respect was entirely negative. While negative testimony may be sufficient to establish such issue (*Walters* v. *Chicago, M. & Puget Sound Ry. Co.*, 47 Mont. 501, 133 Pac. 357, 46 L. R. A. (n. s.) 702; *Riley* v. *Northern Pac. Ry. Co.*, 36 Mont. 545, 93 Pac. 948; *Mullery* v. *Great Northern Ry. Co.*, 50 Mont. 408, 148 Pac. 323), the attendant circumstances must be such as to afford a reasonable opportunity to hear the warning signals (*Howe* v. *Northern R. Co. of New Jersey*, 78 N. J. Law 683, 76 Atl. 979; *Davis* v. *Payne*, 120 S. C. 473, 113 S. E. 325). Applying these rules, however, to the evidence in the instant case, we are unable to conclude that the attendant circumstances were such that reasonable men could reach no other conclusion than that no reasonable opportunity was afforded to plaintiff and Ballinger to hear the warning signals.''

In the *Rau Case*, supra, the court made the following statement: ''The statement of a witness that he did not hear such a signal is without value as evidence, unless it further appears

that he was in a position to hear, was attentive, and that the conditions were such that he would probably have heard such signal, if it had been sounded.''

These cases announce the proper rule, as do also the following ones: *Pere Marquette Ry. Co.* v. *Anderson,* (7 Cir.) 29 Fed. (2d) 479; *Bergman* v. *Northern Pac. Ry. Co.,* (8 Cir.) 14 Fed. (2d) 580; *Seaboard Air Line Ry. Co.* v. *Myrick,* 91 Fla. 918, 109 So. 193; *Klein* v. *United Rys. & Elec. Co.,* 152 Md. 492, 137 Atl. 306; *White* v. *Southern Ry. Co.,* 151 Va. 302, 144 S. E. 424; *Lawson* v. *Minneapolis etc. Ry. Co.,* 174 Minn. 404, 219 N. W. 554.

It will thus be observed that under this rule plaintiff's testimony was insufficient to prove the alleged negligence. It is true that in this instance the boy and two other witnesses gave similar negative testimony, but this negative testimony was combated and contradicted by the positive testimony of five witnesses who stand unimpeached and supported by the circumstances in the case, which brings us to a proposition that has frequently confronted this court.

In *Haddox* v. *Northern Pac. Ry. Co.,* 43 Mont. 8, 113 Pac. 1119, 1122, this court said: ''Juries may not arbitrarily and capriciously disregard testimony of witnesses, not only unimpeached in any of the usual modes known to the law, but supported by all the circumstances in the case.''

Defendants rely upon the rule laid down in *Casey* v. *Northern Pac. Ry. Co.,* 60 Mont. 56, 198 Pac. 141, which is to the effect ''that whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a reversal should occur.'' Of course, this court has consistently adhered to the rule that questions of credibility are for the jury alone. The general rule was well expressed by the Supreme Court of the United States in the case of *Chesapeake & Ohio R. Co.* v. *Martin,* 283 U. S. 209, 51 Sup. Ct. 453, 456, 75 L. Ed. 983, as follows: ''We recognize the general rule, of course, as stated by both courts below, that the question of the credibility of witnesses is one for the jury alone; but this does not mean that the jury is at

liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt. The complete testimony of the agent in this case appears in the record. A reading of it discloses no lack of candor on his part. It was not shaken by cross-examination; indeed, upon this point, there was no cross-examination. Its accuracy was not controverted by proof or circumstance, directly or inferentially; and it is difficult to see why, if inaccurate, it readily could not have been shown to be so. The witness was not impeached; and there is nothing in the record which reflects unfavorably upon his credibility. The only possible ground for submitting the question to the jury as one of fact was that the witness was an employee of the petitioner. In the circumstances above detailed, we are of opinion that this was not enough to take the question to the jury, and that the court should have so held.''

Here the only reflection that may be cast upon the witnesses who testified as to the ringing of the bell and the blowing of the whistle is the fact that most of them were employees of the railway company, and, as the United States Supreme Court said, that is not enough to render their testimony unbelievable.

The application of the rule announced in the *Casey Case* is to be found in the fact that plaintiff gave conflicting testimony or made conflicting statements with relation to material facts, viz.: in her first signed statement she said she did not look to the west or east and made no mention of seeing a locomotive at all. In her complaint she said that she looked to the west only at a point 25 feet south of the first Great Northern track and saw no locomotive standing. At the trial she said she looked again between the third and fourth tracks and saw the locomotive. In her deposition taken before the trial she said that the engine was either standing still or almost standing still. She explained that her reason for thinking so was that the smoke was going straight up. We have already adverted to the fact that her testimony was conflicting and contradictory on the question of the conditions of the windows of

the car. The only testimony in the record as to the locomotive being at a standstill at the time the plaintiff approached the track is this last statement that she made. There is no other testimony that the locomotive had stopped, while on the other hand all of the members of the train crew testified that the engine was moving slowly—about $4\frac{1}{2}$ or 5 miles an hour—all of the time involved. It is obvious that a starting signal by the engineer with the whistle was not required if the engine was moving all the time. The contention that it was not given was of necessity predicated upon the theory that the engine was standing still when plaintiff first saw it, and that thereafter it started up without a starting signal. It thus becomes obvious that the questions as to the constant ringing of the bell and the crossing signal are about the only things left upon which plaintiff's theory could be predicated.

To us the question whether the engine was standing still or moving slowly seems unimportant. Under any of the theories advanced plaintiff admitted knowledge of the fact that there was a locomotive standing "or almost standing still" near the crossing, fired up, with smoke ascending and in dangerous proximity to the crossing. This should have been enough to put her on her guard. The fact that there was an approaching automobile did not justify her in giving her whole attention thereto. (*Normandin* v. *Payne,* 65 Mont. 543, 212 Pac. 285; *West* v. *Detroit Terminal R.,* 229 Mich. 590, 201 N. W. 955; *Southern R. Co.* v. *Priester,* (4 Cir.) 289 Fed. 945; *Haffke* v. *Missouri Pac. R. Corp.,* 110 Neb. 125, 193 N. W. 257; *Lee* v. *Chicago etc. R. Co.,* 68 Minn. 49, 70 N. W. 857; *Smith* v. *Chicago etc. R. Co.,* 137 Wis. 97, 118 N. W. 638.)

The duty resting upon plaintiff was well described by this court in *George* v. *Northern Pac. Ry. Co.,* 59 Mont. 162, 196 Pac. 869, 871, where it said: " 'Every person is bound to an absolute duty to exercise his intelligence to discover and avoid dangers that may threaten him. When, therefore, a plaintiff asserts the right of recovery on the ground of culpable negligence of the defendant, he is bound to show that he exercised his intelligence to discover and avoid the danger,

which he alleges was brought about by the negligence of the defendant.' This statement of the rule requires the person approaching a railway crossing to take all reasonable precaution to assure himself by actual observation that there is no danger from an approaching train. The failure of the persons in charge of the train to·keep a lookout and to give warning signals of its approach to the crossing does not relieve the traveler from the necessity of making a vigilant use of his senses to ascertain whether it is safe to proceed. (*Railroad Co.* v. *Houston,* 95 U. S. 697, 24 L. Ed. 542; *Hunter* v. *Montana Central Ry. Co.* [22 Mont. 525, 57 Pac. 140], supra.) It is not always sufficient if he does look and listen. The obligation resting upon him is to exercise care to make the act of looking and listening reasonably effective. (*Sprague* v. *Northern Pac. Ry. Co.,* 40 Mont. 481, 107 Pac. 412.) If he goes upon the crossing without taking this precaution, he is guilty of contributory negligence, and, if injured, cannot recover.'' (See, also, *West* v. *Davis,* 71 Mont. 31, 227 Pac. 41; *Normandin* v. *Payne,* supra; *Grant* v. *Chicago, M. & St. Paul Ry. Co.,* supra; *Rau* v. *Northern Pacific Ry. Co.,* supra; *Scherer* v. *Southern Pac. Co.,* 140 Cal. App. 528, 35 Pac. (2d) 356; *Smith* v. *Oregon S. L. R. Co.,* 47 Idaho, 604, 277 Pac. 570.)

The circumstances of this case were not the same as an ▮▮ ordinary crossing accident. Here were seven tracks of three different railways. In fact, the scene of the accident was really in railroad yards where the greatest degree of care and caution should have been observed. A case in point is *Easley* v. *Pennsylvania R. Co.,* 238 Pa. 67, 85 Atl. 1132, where the plaintiff's team was hit by the tender of the engine attached to some cars. The court in reversing the judgment for plaintiff on the ground of his contributory negligence said: ''His plea is that, when he stopped and looked, he saw the cars a very short distance south of him, but thought they were standing still, though he had a clear and unobstructed view of them. * * * He admits that he saw the train, and, because he thought it was standing still, paid no further attention to it until it was so close to him that he could not avoid

it. These are his own words, frankly confessing a degree of carelessness in crossing a railroad track, which imperatively calls for a reversal of the judgment. What the appellee must have seen, if he had exercised ordinary care in looking, he is conclusively presumed to have seen, and the excuse which he gives is no better than if he had admitted he had not looked at all." (See, also, *Mehegan* v. *New York Central & H. R. R. Co.*, 64 Hun, 637, 19 N. Y. Supp. 444; *McFarland* v. *Chicago etc. Ry. Co.*, 51 S. D. 85, 212 N. W. 493; *Ash* v. *Wilmington & N. R. Co.*, 148 Pa. 133, 23 Atl. 898; *Wilkinson* v. *Oregon S. L. R. Co.*, 35 Utah, 110, 99 Pac. 466; *Caldwell* v. *Kansas City etc. R. Co.*, 58 Mo. App. 453; *Chicago Terminal Transfer R. Co.* v. *Korando*, 129 Ill. App. 620.)

Here plaintiff admitted that she saw the engine but concluded that it was standing still, and thereupon gave no further attention to it on the theory that it would signal before starting. The jury could not disregard the effect of this admission, which, in our opinion, brings the case squarely within the rule of the cases just cited.

The judgment is reversed with instruction to the district court to dismiss the action.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICE MORRIS concur.

MR. JUSTICE ERICKSON:

I dissent. I believe the facts of this case do not warrant the conclusion of the majority that the testimony on behalf of the plaintiff was mere negative testimony within the rule stated in the majority opinion. There is more here than a mere "I did not hear it" statement.

The true rule to be applied as to negative testimony under facts like these was stated by this court in *Riley* v. *Northern Pac. Ry. Co.*, 36 Mont. 545, 93 Pac. 948, 952, as follows: "On the part of the defendant there was positive testimony that the bell was ringing and the light burning. The plaintiff's wit-

nesses simply testified that they did not hear any bell or see any light. Appellant argues that this negative testimony is of no weight, in view of the positive testimony opposed to it. Ordinarily, when one witness testifies positively that a certain thing existed or happened, and another witness, with equal means of knowing, testifies that the thing did not exist or happen, the so-called negative testimony is so far positive in character that a court could not say that it was entitled to less weight than the affirmative testimony.''

The majority cites *Grant* v. *Chicago, M. & St. Paul Ry. Co.*, 78 Mont. 97, 252 Pac. 382, and *Rau* v. *Northern Pac. Ry. Co.*, 87 Mont. 521, 289 Pac. 580, as authority for the conclusion that the testimony of plaintiff's witnesses as to the sounding of the whistle and the ringing of the bell is the type of negative testimony that the court must say, as a matter of law, is of no evidentiary value. In the *Grant Case* the facts were wholly dissimilar from those in the present case. There the whistle, if blown, was blown at a point from 825 to 1,320 feet distant from the crossing, while here the whistle, if blown, must have been blown at a point within 150 feet of the crossing. The opportunity for the witnesses to hear the whistle, if sounded, was much greater than in the *Grant Case*. However, I do not agree with the decision in that case in its application of the rule on negative testimony.

The *Rau Case* has no force in sustaining the conclusion of the majority. The rule was stated in that case, but the court did not hold that the negative testimony was of such a character that it had no evidentiary value and should, therefore, be excluded; but the court said: ''Here we have testimony of negative character of but little evidentiary value, in view of the surrounding circumstances.'' And the court goes on to say: ''Conceding the sufficiency of such negative testimony to establish the fact, yet the statute did not excuse the deceased from the exercise of at least ordinary care for his own safety.'' The *Rau Case* was decided on the basis of the contributory negligence of the deceased, and was in no way based on the theory

that the evidence of the witnesses was of such a negative character as to make it valueless.

Mrs. Sullivan and her son were within at most 200 feet of the locomotive and traveling at a low rate of speed. They both testified on the stand that the windows of the car were open and that their hearing was good. By that testimony it seems to me clear that they have shown that the facts fit what was said in the *Riley Case*, and if what the majority has said stands, then I do not see how in any case the non-existence or non-happening of any thing or event can ever be proven, if there is positive testimony that it did exist or happen. The witnesses were in the very position of the traveler whom the signal was meant to warn. If they could not hear it had it been given, it would seem the requirement that any signal be given is a foolish one, and every traveler must proceed on the assumption that none will be given because even if given it would be so weak that he could not hear it.

Now let us see how strong the positive testimony on this point and others is. First, it is testified by defendant's witnesses that the engine did not stop; yet there is abundant testimony by them that as they approached the semaphore they had to signal a towerman some two blocks away for the board, and that until they got it they had to wait before proceeding past the semaphore tower. In other words, they testified, in effect, that it was the usual practice, or at least it often happened, that they had to stop right where the plaintiff and her son said they were stopped. The witness Stewart is the only one who testified that he did not stop between Warren and Garden Avenues; while the witness Noonan, one of the crewmen, says: "As I recall it the engine gave one long whistle for the semaphore and got it and it was answered by two and then we proceeded on down." That testimony certainly raises the inference that they did stop west of the semaphore and did not proceed until the semaphore arm was raised. The same inference is raised by the testimony of the witness Hadrath, a member of the train crew.

As to what whistles were blown, and where and when, there is also conflict among the defendant's witnesses. The engineer Stewart testifies to a series of short, sharp blasts just a moment or two before the collision. No other member of the crew testifies to this. They all say that he gave just the usual crossing signal. None of them, except Stewart, presumes to say where the signal was given, and much of their testimony indicates that no signal at all was given after crossing Warren Avenue. Instead of their testimony being clear, convincing, uncontradicted and corroborated, it is confusing, unconvincing and uncorroborated, and most of it starts with, "As I remember it," or "As I recall it," or "We usually do this or that."

The testimony represents the typical situation of a clear conflict in the evidence, and the district court properly submitted the matter to the jury. The circumstances support the testimony of the witnesses for the plaintiff as well as they support the testimony of defendant's witnesses.

The majority opinion states that this court has consistently adhered to the rule that questions of credibility are for the jury alone. That may have been true in the past, but the majority opinion apparently signals the end of that adherence when it says that the testimony of the plaintiff and her witnesses is of the type considered in the *Casey Case,* 60 Mont. 56, 198 Pac. 141. The only contradictions in statements made by the plaintiff—and they are not substantial—occur between the written statement she signed the day after the collision, and her testimony on the stand. That statement was prepared by an agent of the defendant and was signed by plaintiff when all of the testimony shows that she was in a very bad mental state. She was told that she would be taken care of if she signed it, and she testifies that she did not read it before signing it. On the stand she testified directly on the points contained in the statement, and her testimony was clear, direct and corroborated by other witnesses. She told the same story consistently on the stand, and cross-examination failed to weaken her testimony.

The majority, in applying the rule of the *Casey Case,* finds contradiction between her first statement and her testimony on

omissions in the first statement, the one prepared by the agent of the company. As I have said, under the circumstances that statement should receive little or no consideration by this court or any other, but even if it is considered I cannot see that an omission to say that she saw the locomotive would show the type of contradiction contemplated in the *Casey Case.*

Much is made of the fact that in the signed statement it is said her car window was closed on the side from which the locomotive approached, while on the stand she testified it was open. Her testimony on the stand was corroborated by the clear, convincing testimony of the other passenger in the auto, her son. Nowhere in her testimony was there a single element of that willful misstatement, contradiction and general fitting of the testimony to suit the developments of the case that exist in the *Casey Case,* and to discredit her testimony as is done by the majority does violence to every rule affecting the question of the credibility of the witnesses and announces to the litigants, the bar and the courts of Montana that it shall be the duty of the trial court to exclude the testimony of every witness as soon as any slight variance occurs between what a witness has said some time in the past, and what he says on the stand, and his testimony must be excluded even where he failed to say something in the past and later says it on the witness stand.

I cannot see that *Normandin* v. *Payne,* 65 Mont. 543, 212 Pac. 285, cited in the majority opinion, is authority for the conclusion that if the locomotive were standing still, and if plaintiff saw it, she had no right to proceed in reliance on defendant's performing its duty of warning her by appropriate signals. In that case the view of the track was unobstructed for a half mile each way; plaintiff's car was not under control, and no element of the question of the traveler's duty on seeing a train standing still or slowly approaching appears. Neither can I see that any of the other cases cited with the *Normandin Case* in support of this conclusion are in point. In none of them does the element of a standing locomotive or a slow moving locomotive occur. In fact, in each of these cases the case is deter-

mined on facts where there was a rapidly moving engine and the plaintiff did not look at all for it.

I agree with what the majority says as to the duty of the traveler in approaching a railroad crossing; however I think the rule is better stated in *Everett* v. *Hines,* 64 Mont. 244, 245, 208 Pac. 1063, 1068. After stating the substance of the *George Case,* cited by the majority, and others, it brings the Montana rule in harmony with the rule in all other jurisdictions, when the court says: "But no more is required than that he shall exercise such degree of vigilance and caution to avoid accident as a reasonably prudent man would do under like circumstances."

One of the circumstances which must be considered in determining the duty of the plaintiff here is the presence of a standing locomotive. On appeal we must take the most favorable view of plaintiff's testimony and must conclude that the locomotive was standing still. The rule is that the presence of a standing locomotive discovered by plaintiff reduces the degree of care she must exercise, as she may rely on the engineer giving the necessary signals before starting up the engine. The leading and almost universally accepted case on this point is *United States Director General of Railroads* v. *Zanzinger,* (4 Cir.) 269 Fed. 552, 554. There a pedestrian saw a standing locomotive and, relying on the signals being given, proceeded on to the crossing without again looking at the engine. The court said: "But the degree of intentness of looking and listening requisite to constitute due care depends upon circumstances. * * * A man of ordinary prudence would hardly hesitate to go over a crossing near to a passenger train stopped at a station, relying upon his attention being arrested by the invariable bell signal of starting. The presumption that an engine of a standing train will give warning before going over a crossing is greater than if the train were running. * * * " To the same effect see *Louisville & Nashville R. Co.* v. *Cooper,* 65 S. W. 795, 23 Ky. Law Rep. 1658, wherein the court said: Appellee had a right to assume that in moving its train appellant's servants in charge of it would give proper signals by bell or whistle before running

upon the crossing, and when she saw it standing still 150 feet away we think it was properly left to the jury to determine whether she exercised such care as might reasonably be expected of a person of ordinary prudence, situated as she was.'' The rule is also so stated in the able dissent of Justice Straup in *Wilkinson* v. *Oregon Short Line Ry. Co.*, 35 Utah, 110, 99 Pac. 466.

I have examined carefully the cases cited in the New York opinion, beginning with the case of *Mehegan* v. *New York Central & H. R. R. Co.*, 64 Hun, 637, 19 N. Y. Supp. 444, next to the last paragraph, and find but two of the cases in point, those being the early New York case and the Utah case I have just mentioned. It is to be noted that there was a dissenting opinion in the Utah case. The great weight of authority and the modern rule is that contained in the *Zanzinger Case*, supra, on the effect of a standing train on the duty of the pedestrian.

I can come to no other conclusion than that the learned district judge was correct in his rulings on all of the points covered in the majority opinion, and the points on which the lower court is reversed. Instead of indulging any presumption in favor of the correctness of the action of the lower court, the law is strained and the testimony is viewed in the worst light to effect the reversal of the lower court. That court properly left to the jury the determination of the weight to be given plaintiff's testimony, and correctly left to the jury the determination of the existence or non-existence of contributory negligence on the part of plaintiff. There was ample evidence to sustain the verdict and the lower court should be sustained.

MR. JUSTICE ANGSTMAN:

I concur in the dissenting opinion of MR. JUSTICE ERICKSON.

Rehearing denied October 14, 1939.